(Reap. Dec. 9062)

W. R. Zanes & Company et al. v. United States

Entry No. 2950–H, etc.

(Decided January 29, 1958)

*Siegel, Mandell & Davidson* (*Sidney Mandell* of counsel) for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the defendant.

Wilson, Judge: The merchandise involved in these appeals consists of a product known as quebracho extract, a tanning material, which was produced in Argentina, shipped to Holland, and subsequently transshipped to the United States. The goods were entered on the basis of their value in Argentina, the country of production, and were appraised on the basis of their value in Holland, the country from which they were immediately imported.

A stipulation was entered into between counsel for the respective parties to the effect that if the court finds that the merchandise is subject to duty on the basis of the Argentine values, then the entered values are correct, but that if it should be found that the merchandise is subject to duty on the basis of the value of the goods in Holland, then the appraised values are correct.

The record discloses that the purchase and sale of the involved merchandise originated in August or September 1951 by contact with a representative of the manufacturer in Buenos Aires, who informed the ultimate consignee herein that the commodity in question could be procured through a firm in Holland; that, subsequently, contracts of sale were concluded between the Argentine producer, the Holland shipper, and the American importer. Plaintiff's witness, who was the manager of the purchasing concern, testified, in this connection, that he had advised the seller's representative that the purchase of the involved commodity was subject to the condition that the merchandise be of good quality and, further, that the same price be paid for such goods as would be paid were the merchandise imported from Argentina. Accordingly, he stated that, in each of the involved importations, the

cost to the importer was no greater by reason of the fact that these goods were shipped via Rotterdam rather than direct from Buenos Aires and, further, that the charge for ocean freight was no higher than that normally charged from Buenos Aires to New York, or Houston, or New Orleans. In explanation of the method of shipment of the involved goods, plaintiff's witness stated:

* * * Now the reason for the so-called transshipment is as follows: In 1951 Holland was very short of dollars and there were switch deals made in which Holland was buying merchandise in their own currency in a trade agreement by a permit from the Dutch Government and a license to sell the material to a dollar country, like this country, and in turn the quebracho was bought in Dutch currency, clearing in Dutch currency and sold to this country payable in U. S. dollars. The quebracho was shipped from Buenos Aires to Rotterdam and transshipped from Rotterdam to Houston or New Orleans, or wherever it went. (R. 13–14.)

Certain documents introduced in evidence by the plaintiff covering the involved quebracho extract indicate that the merchandise after arrival in Rotterdam "was under constant Transit Customs Custody during the transshipment at Rotterdam" and include affidavits of the Holland shipper sworn to before the American vice consul to the effect that the goods "were never cleared through the Dutch Customs for entry and consequently constituted a transit-lot" (plaintiff's collective exhibits 1 to 7, inclusive).

Defendant's exhibit A is a report made to the Commissioner of Customs by an American vice consul at Rotterdam, dated August 7, 1952, outlining, as heretofore indicated, the involved merchandise made by the Holland exporter and the subsequent sales to the American importer. The report (page 3) indicates under "Prices and Terms" that "The terms of sale are C. & F. Buenos Aires *direct* to United States Port." [Italics quoted.] Attached to said exhibit is a schedule of sales for exportation to the United States covering the involved period. The schedule indicates the prices per metric ton, which it appears are the prices which prevailed in Argentina during the period in question and which are represented by the invoiced prices herein on the dates of exportation.

Defendant's exhibit B is a further Rotterdam consular report, dated January 7, 1954, furnishing additional information to the Commissioner of Customs respecting importations of quebracho extract made by the seller herein. Said report states (page 2) that the Holland exporter confirmed that the above-listed shipments of quebracho extract were purchased from several Argentine suppliers for the express purpose of resale to the American market and were not intended for consumption in The Netherlands. The report observed, however, that purchases of the imported commodity made by the Holland exporter "included orders for the home and world market."

In the case of *United States* v. *F. W. Hagemann*, 39 C. C. P. A.

(Customs) 182, C. A. D. 484, certain chemicals manufactured in Germany were shipped to the United States via Rotterdam, The Netherlands, under the name of "Liquitol." The invoice was headed "Den Haag, 19 January, 1938," and the prices shown were in reichsmarks. The goods were invoiced and entered on the basis of the German values. The appraiser at the port of New York used United States value, as provided in section 402 (e) of the Tariff Act of 1930 (19 U. S. C., sec. 1402 (e)), "on the theory that The Netherlands was the country of exportation in which there was no foreign or export value." In sustaining the entered values, the Court of Customs and Patent Appeals, page 185, held:

There is evidence of the fact that Liquitol is a trade-name of the importer and that the same commodity is known in Germany as "Alurit" and also as "Lunker-pulver" or "Lunkerit." It appears that the N. V. Internationale Compagnie of Holland was the exporting agent for the German manufacturer. In an affidavit of a director and manager of the Dutch company it is stated that the merchandise made in Germany was destined at the time it left that country to the Alpha Lux Company, Inc.; that the goods did not enter the trade or commerce of The Netherlands; that it had not been processed or treated in any manner there, but was exported from Rotterdam in the same condition and state that it left Germany. There is evidence that merchandise, the same as that which is here involved, is sold for home consumption in Germany under the German names heretofore mentioned and at the same price which was paid in Germany for the involved merchandise.

In its decision, the appellate court refused to weigh certain contradictory evidence concerning the treatment of the goods after arriving in Holland, upon the ground that while there was a report from a Treasury attaché to the effect that another chemical was added to the German-manufactured product in Holland, another report stated that the merchandise passed through The Netherlands "without being in any way manipulated by the Dutch company." Upon this point, the court stated, at page 185:

It is not our function, in a proceeding of this character, to weigh evidence. That is the duty of the tribunals below. After a careful examination of the record, we are of opinion that there is substantial evidence to sustain the judgment from which this appeal has been taken.

In the *Hagemann* case, *supra*, the court distinguished the cases of *D. & B. Import Corp.* v. *United States*, 29 C. C. P. A. (Customs) 65, C. A. D. 172, and *Tower & Sons* v. *United States*, 67 Treas. Dec. 1358, Reap. Dec. 3535.

In the *D. & B. Import Corp.* case, *supra*, Bacardi rum was sold by a Cuban producer to a firm in Bermuda where the merchandise was placed by the purchaser in a bonded warehouse. It remained there for more than 1½ years and was then sold and later imported into the United States from Bermuda. The court held the merchandise

to be an importation from Bermuda and not from Cuba. In finding that the importation was not entitled to the benefit of preferential treatment under certain trade agreements as an importation from Cuba, the court observed that when the rum was shipped from Bermuda to the United States it constituted commerce, not between Cuba and the United States, but between Bermuda and the United States.

In the *Tower & Sons* case, *supra*, certain imitation pearl beads had been exported from Japan to New York, where the merchandise was held in bond and then shipped to Canada. There, offers for sale were made, but none being accomplished, the beads were reshipped to the United States. The court held that the merchandise had entered into the commerce of Canada and, as such, the shipment constituted an exportation from Canada and not from the country where it was originally purchased.

In *United States* v. *Geo. E. Mallinson Importing Co., Inc.*, 14 Cust. Ct. 382, Reap. Dec. 6125, the court summarized the facts as follows:

* * * The merchandise involved consists of sea-grass rugs or squares the product of French Indo-China which left there in July 1941, for Hong Kong from whence they were shipped to the United States. They were entered at $.1375 per square foot, Hong Kong currency, plus packing. They were appraised at $.1375 per square foot, Hong Kong currency, plus forwarding expenses Haiphong to Hong Kong, marine insurance Haiphong to Hong Kong, storage at Hong Kong, telegram Haiphong to Hong Kong, and packing, as invoiced. Both the entered and appraised value represent export value.

The issue before the court was, which city, Haiphong, in French Indo-China, or Hong Kong, was the principal market for the goods. Testimony was adduced on behalf of the importer that when the rugs in question left the establishment of the manufacturer in French Indo-China they were destined for shipment to the United States and had been manufactured solely and expressly for the importer; that they were definitely marked for the importer; that there was no diversion of the shipment nor any intention to divert the shipment after it left French Indo-China; that the rugs were shipped to the United States by way of Hong Kong, were not held for offer or sale to all buyers in Hong Kong, but were merely sent via Hong Kong for lading aboard a steamer sailing to the United States. The court upheld the finding of the trial judge that Haiphong was one of the principal markets for the rugs and that French Indo-China was the country of exportation, and held the rugs to be dutiable on the basis of export value from that country. In so doing, the court, in the *Mallinson* case, *supra*, pointed out that the trial judge found that the facts of the case were to the same effect as those in the case of *Hensel, Bruckmann & Lorbacher, Inc., for a/c Fred'k Blank & Co.* v. *United States*, Reap. Dec. 3132, affirmed in *Id.* v. *Id.*, Reap. Dec.

3207. In the latter case, certain wallpaper was sold by a corporation in Basle, Switzerland, to a New York importer. The goods were manufactured in Germany by a subsidiary company and shipped in bond through Swiss territory, and sailed from a port in Germany for New York. The invoice, which was made out in United States currency, was certified in Switzerland. The court held that the goods when they left Germany were intended for export to the United States, and that there was no proof that the whole or any part thereof was diverted or was intended to be diverted from its original destination. It, therefore, held that the country of exportation for the goods there involved was Germany.

Referring to the *Hensel, Bruckmann & Lorbacher, Inc.*, case, *supra*, the court, in the *Mallinson* case, *supra*, page 385, stated:

* * * It is true that the record in that case was much fuller than the record before us in the instant case. However, we think the reasoning may be applied to the case before us, and it is the opinion of the court and we so hold that the presumption of correctness attaching to the appraiser's finding of value has been overcome by the evidence produced on the part of the appellee, and that such evidence is not refuted by statements on the invoice. Invoice statements are not conclusive. See *United States* v. *Meadows, Wye & Co. (Inc.)*, T. D. 41622, 49 Treas. Dec. 959.

On the other hand, the cases hold that where goods originating in one foreign country pass through another foreign nation, before being shipped to the United States, and the said goods in any way become part of the commerce of the second nation or in some manner are manipulated so as to change their form, then they lose their identity as an exportation of the country of origin and are properly valued on the basis of an exportation from the second country.

In the case of *United States* v. *T. D. Downing Co.*, Reap. Circ. 955, the court had under consideration certain merchandise imported from England by a Canadian firm. Part of the shipment was withdrawn in Canada and the balance held in bond and thereafter shipped to the United States. The court, in the decision, observed that, while the merchandise involved therein did not enter into consumption in Canada, it was clear from the testimony that its reshipment to the United States was an afterthought. In upholding the Canadian value, the court stated:

Merchandise imported from one country, being the growth, production, or manufacture of another country, must be appraised at its value in the principal markets of the country from which immediately imported, unless it is shown that it was destined for the United States at the time of the original shipment *without any contingency of diversion*. Accordingly we hold that the merchandise involved herein is an importation from Canada. See Geo. W. Booth *v.* United States, G. A. 4719 (T. D. 22338). [Italics supplied.]

The case of *J. T. Steeb & Co. (Inc.)* v. *United States*, Reap. Circ. 2716, decided in 1932, involved a shipment of shoes, manufactured in England and shipped to Vancouver, B. C., and thence to Portland, Oreg., U. S. A. The appraiser found the dutiable value to be the Canadian value. In upholding the appraised value, a single judge, in a reappraisement appeal, held as follows:

> In the case now before me I am unable to find. from the evidence that the original destination of the goods was the United States. The testimony of the importer that he intended the goods to be shipped to Portland is no proof that their destination was Portland at the time of the original shipment. Moreover, the importer was unable to produce the order for these goods, and his attorney refused to ask for a continuance, at the suggestion of the court, in order that same might be produced.

> I find upon this record that this was an importation from Canada and properly dutiable upon the basis of the market value in that country.

See also *Maier, Morton & Browne* v. *United States*, 11 Ct. Cust. Appls. 115, T. D. 38753, and *Miramonti Brothers et al.* v. *United States*, Reap. Circ. 1709.

In the case under consideration, the issue is really one of fact, since once the facts are determined the law applicable is readily available.

In their brief, counsel for the plaintiff states:

> The contention of the plaintiff is that the Quebracho Extract which was produced in Argentina and shipped to Holland for transshipment to the United States is properly dutiable on the basis of the export value prevailing in the country in which the merchandise was produced and originally shipped from * * *.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> The evidence is conclusive that the merchandise, when shipped from the Argentines, was intended for H. Elkan & Co. of New York City via Holland and under existing laws were permitted to land at Holland only with the understanding that they were to be transshipped to the United States. The fact that the consular invoices and bill of lading papers do not indicate this fact is not conclusive.

On the other hand, counsel for the Government argues that:

> The facts demonstrate that the merchandise was produced in Argentina and was shipped to Holland. 'That Holland finally exported the merchandise to the United States, the consular invoices having been authenticated. at Rotterdam, Holland. That upon shipment from Argentina to Holland, the bills of lading did not show that the merchandise was destined for the United States or that a sale had been consummated between the Argentine producer and the importer. Sales were only consummated and payment made between the importer and the Holland exporter. The importer did not pay to Argentina. Holland paid to Argentina.

> The facts also show that the Holland exporter did not merely handle the goods while in Holland as "intransit" as said merchandise was included in much larger shipments received by Holland from Argentina from various suppliers. There was no segregation of the involved importations from the entire lots received from Argentina by Holland. The account was not handled on a commission basis

by Holland either for Argentina or the importer. Holland made a *profit* on each and every transaction herein involved as well as on all shipments made to the United States.

It is further argued by the Government that the identical product was shipped to Holland for home consumption as well as for export to foreign countries other than the United States.

After a careful review of the entire record, I am of the opinion that the oral and documentary evidence sustains the position of the importer; that the goods involved were actually destined for the United States market when they left Argentina; that there are no facts to indicate that the goods ever became part of the commerce of Holland. On the contrary, the evidence shows that they were held in customs custody in Holland for shipment to the United States. The fact that the entire shipments from Argentina were not destined for the United States is not, in my opinion, persuasive, because, as the evidence shows, certain definite amounts were so destined, and the fact that the invoices did not show that the goods, when shipped from Argentina, were destined for the United States is not conclusive. See *United States* v. *Geo. E. Mallinson Importing Co., Inc., supra.*

Upon a full consideration of the entire record, I find as facts:

1. That the merchandise involved herein consists of a quantity of quebracho extract, a tanning material, manufactured in Argentina.

2. That the goods were shipped from Argentina by way of Holland to the United States upon an order placed by the importer with the Argentine shipper and, at the time of shipment from Argentina, were destined for the United States.

3. That the principal market in Argentina for such merchandise was Buenos Aires.

4. That the goods did not become part of the commerce of Holland and were in no way changed while in that country; and that the payment in American dollars to the shipping company in Holland was by way of a so-called "switch transaction," which enabled the Holland merchants to obtain badly needed dollars.

5. That such or similar merchandise was freely offered for sale and sold for export in the principal market to all purchasers, in the ordinary course of trade, at prices which did not vary according to the quantity purchased, and that such prices were equivalent to the invoiced and entered values herein.

I, therefore, conclude as matters of law:

1. That the goods under consideration are importations from Argentina and that they are properly dutiable upon the basis of the market value in that country.

2. That the proper basis for the determination of the value of the involved merchandise is export value, as that value is defined in section 402 (d) of the Tariff Act of 1930.

3. That the foreign market value for said merchandise in Argentina did not exceed said export value.

4. That the proper dutiable export value of the involved merchandise is as set out in finding of fact No. 5.

Judgment will be rendered accordingly.